# CHARLESTON.

## WESTERN MINING AND MANUFACTURING COMPANY
### *v.*
## PEYTONA CANNEL COAL COMPANY.

March 4, 1875.

1. Generally, when, in a deed, lines and corners are described, or when from the statement of courses and distances or other descriptions, in connection with circumstances existing and manifest, or ascertainable, at the time of the execution of the deed, it is presumable that such lines or corners are those referred to in the deed, the statement of courses and distances is, in construction, controlled by the actual lines and corners referred to.

2. But the mere circumstance that lines and corners are known to have been run and marked, or are found marked near where the courses and distances mentioned in the deed run, is not conclusive that they are the lines and corners of the land referred to in the deed. And when there is no such approximation in the courses or length of the lines, or the marks on the corners, to the description in the deed, as to warrant the presumption that they are the boundaries of the land to which the deed relates, such marked lines should be disregarded.

3. Lines and corners may be marked with the purpose to adopt them in a contemplated deed; but afterwards the marked lines and corners may be abandoned, and mere courses and distances from certain objects or points may be substituted.

4. There is no uniform rule that the length of one line, as mentioned in a deed, shall control the course of another line, or that the latter shall control the former. Other circumstances will determine the adoption of the one or the other.

5. Though the quantity of the land mentioned in the deed, will not control the boundary, when ascertained by the description, with other paramount circumstances, nevertheless, the correspondence

of quantity given by a line in question, with the quantity mentioned in the deed, or an approximation to such correspondence, may be considered as tending to establish such line as the true one.

1875.
January Term.

Western Mining
and Manufacturing Co
v.
Peytona Cannel
Coal Co.

6. Generally, it will not be presumed that a party granting land intends to retain a long narrow strip next to one of his lines; but if the courses and distances approximate closely to a line or corner of the tract owned by the grantor—especially if the description in the deed corresponds, exactly or substantially, with the description in the title papers under which the land is held—it will be presumed that the lines mentioned are intended to reach the corners and run with the lines of the tract, though the trees marked and described have disappeared before the making of the deed.

7. A writing solemnly signed, sealed, acknowledged before a magistrate, and delivered, by a person, is evidence of his intent, so convincing and conclusive, that, at common law, generally, no evidence will be received to contradict it.

8. In a court of equity, however, it may sometimes be proved that the deed was executed in mistake, and that, in fact, it embodies provisions different from those which the parties intended it to embody. But, even in this court, the deed is regarded as evidence so strong, that only other unequivocal evidence irresistibly conclusive, is sufficient to overthrow it.

9. A stockholder in an incorporated company is not so jointly interested with the other stockholders, or so identified with the corporation, that his unauthorized and unwarranted acts will be deemed theirs, or in any manner bind them, to their detriment.

10. It is not the duty of the owner of one tract of land to ascertain its boundary for the information of the owner of a coterminous tract, who, without himself ascertaining the boundary, constructs improvements on the other's tract, or on his own. in order to the better development of the former tract. The failure of the owner of the land to obtain and communicate such information is neither actual fraud nor culpable negligence.

11. If, under a mistake as to the true boundary, one such owner speaks of a part of his land, or treats it, as the land of the other, or acquiesces in acts of ownership by the latter over the land; this will not prejudice the title or right of the former, further than, under certain circumstances and upon proper proceedings, to create, and to subject the land to, a lien for permanent improvements made thereon, above the value of the use of the land; or to subject the title and possession to the operation of actual adverse possession continued long enough, under the statute of limitations, to bar an action of ejectment.

12. Certainly such innocent, though erroneous statements or acts, made to or done in the presence of, the owner of coterminous land,

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v
Peytona Cannel
Coal Co

without any purpose to deceive, and not relied on by the other as evidence of boundary, cannot render the party so speaking or acting, in any manner liable, in equity, to the forfeiture of his own land, or the payment of money to indemnify the owner of the adjoining land for improvements he may have made on it, or for expenditures made elsewhere, in order to facilitate and enhance the use and value of the land owned by the other, as to the boundary of which the mistake has existed.

13. The statements, acts, or acquiescence of the owner or claimant of land, are generally evidence against him, under all the circumstances, more or less forcible: But, unless they are vitiated by actual fraud, or culpable negligence tantamount to actual fraud, and are relied on by another as the foundation of material action or acquiescence, they do not estop the owner of the land from asserting and proving his title or boundary.

14. In Virginia and West Virginia, generally, when a person has sold and conveyed a tract of land, described as containing a definite quantity, at a specified price, it is presumed that the estimated quantity was believed to be substantially correct—within five per cent. of exact accuracy—that this constituted a material element in the determination of the price; and that unless it appear that considerable uncertainty or actual risk as to the quantity was contemplated or intended; if in fact the quantity is afterwards ascertained to be materially less, and the purchaser properly asserts his right in a reasonable time and under reasonable circumstances, a court of equity will grant him relief. Though the sale be not by the acre, but by the tract in gross this, nevertheless, is now the rule of decision. But in many, perhaps in most cases of sales by trustees and other fiduciaries or officers, it may be different. When there has been such a sale and conveyance as has been just described, and subsequently an excess of quantity is discovered, if upon no higher principle, at least upon that of mutuality of right between the vendor and vendee, the former as well as the latter should have redress.

15. Because the parties have acted in material mistake as to the quantity that the tract of land sold contained, and so the vendor has agreed to take for the tract a price that, if he had known the quantity, he would not have taken, when there are no sufficient counteracting circumstances, the court will rescind the contract, unless the purchaser will voluntarily do what appears to be just. But, the vendor having sold and conveyed the entire tract, though supposed to contain a less quantity than in fact it did, and so having conferred on the purchaser an absolute estate at law, the former should be content to take an additional sum, proportionate to the price paid, or agreed to be paid, as the excess of quantity is to the estimated quantity of the tract.

16. The purchaser ought to have the option, whether he will submit to a rescission of the sale or conveyance, or pay the additional proportionate price for the excess. But, inasmuch as the vendor's primary right is to a rescission, subject, however, to the qualification just stated, it would seem that, when by the vendor's act or negligence, or without the fault of the purchaser, the vendor's right to a rescission is extinguished, he can no longer be entitled to compensation against the purchaser: Though, perhaps, if it should clearly appear that the bargain was so advantageous to the purchaser, that, if the option of rescission or compensation remained with him, he would elect the latter, the court might compel him to pay the compensation.

1875.
January Term.

Western Mining
and Manufacturing Co.
v.
Peytona Cannel
Coal Co.

17. When the purchaser has sold and conveyed the land to another, for a valuable consideration, without notice of the mistake as to the quantity, the right of the first vendor to a rescission of the sale and conveyance made by him, is extinguished; unless there be such mistake in the last sale and conveyance, made under such circumstances, that the vendor in that sale is entitled to a rescission; when, perhaps, the first vendor having such a right against the latter vendor, may be substituted to his right against the purchaser from him.

18. When a debtor conveys land to a trustee to secure the payment of debts, no definite price is fixed, and so the estimated quantity of the land is not an element in the fixation of the price. Consequently, excess in the actual quantity of the land, can not entitle the grantor in trust to a rescission of the conveyance, or compensation for the excess.

19. The existence of antecedent debts is a valuable consideration for the conveyance or assignment of property to secure the payment of the debts, and the trustee and creditors are purchasers for a valuable consideration.

20. Then, in such case, the trustee and creditors are not, in any manner, liable to the grantor in trust, on account of mistake in quantity, and the grantor has no right against them to rescission or compensation, to which his vendor may be substituted; and any right that, while the original purchaser owned the land, his vendor may have had, to a rescission of the sale and conveyance, is extinguished, unless the trustees and creditors—or at any rate the latter—had notice of the mistake from which the right of the original vendor emanated.

21. Possession of land is evidence that the possessor has the right to the possession that he enjoys. Generally, a person purchasing a tract of land, is presumed to know who has possession of it, and to ascertain the character of the right by virtue of which he holds

52*

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peytona Cannel
Coal Co.

the possession; or, if the purchaser fails to do so, he is charged with notice of the character of the right, so far as this may be necessary to sustain the possession. But the possession by a stranger to the title sold or conveyed, having no right of possession whatever, is not notice, and does not put a purchaser on enquiry, as to a mistake in a former sale and conveyance, relative to the quantity of the land—in no way pertaining to the right of possession—that gave the former vendor the right to a rescission of the sale and conveyance, or compensation for the excess.

22. Whether the time that would bar an action of ejectment for the recovery of land, or a verbal contract for the payment of money or for damages for an injury, elapsed before the discovery of an excess in the quantity of land sold and conveyed, would bar a suit in equity for the rescission of the contract or for compensation for the excess, or not, it may properly be asserted, that if the vendor does not bring his suit within such time after the sale and conveyance, he must make his election and demand, or bring his suit within a reasonable time after the discovery of the mistake. He is not entitled to the time from the sale and conveyance to the discovery of the mistake, and the additional time thereafter that would bar an action, within which to bring his suit.

23. By deed dated the 31st day of March, 1851, P. granted to The V. C. C. Company, a corporation, a tract of land, described as six thousand one hundred and twenty-three acres, containing extensive beds of cannel coal, at the price of $150,000, part in cash and part in stock, the actual value of which may have been more or less than its nominal value. In the spring of the same year the deed was accepted, and the consideration paid. The parties supposed the number of acres mentioned was the actual quantity of the land; but in fact it contained about six thousand nine hundred and seventy-three acres—about eight hundred and fifty more than was estimated. The V.C. C. Company made large improvements on and off the land, intended to facilitate the removal and transportation of its products. On the 6th day of September, 1859, The V. C. C. Company granted the land (except a part previously conveyed) to S. and B., trustees, to secure the payment of antecedent debts to several creditors. At this time none of the parties had discovered the mistake as to the quantity. The W. M. and M. Company, a corporation, claimed that whatever right P. had in or relative to the land, passed to it. In the spring of the year 1860, the parties discovered the mistake as to the quantity of the land. But The W. M. and M. Company made no demand or election to rescind the sale or conveyance. On the 25th day of September, 1865, S. and B., trustees, sold and granted the land to J. B. S., at the price of $85,000—a sum but little more than necessary to pay the debts secured. The purchase, it seems, was made for the benefit of A. and others, some of whom were stockholders in The V. C. C. Company

but others of whom were not. On the 23d day of December in the same year, J. B. S. granted the tract of land purchased by, and granted to him, to A. and others. On the 24th day of March, 1866, The W. M. and M. Company caused a summons in chancery to be issued against The V. C. C. Company; and in May of the same year filed a bill against the latter Company, and, it being assumed that A. and others had transferred an interest in the land to The P. C. C. Company, in the summer of the year 1867, amended the bill so as to make that company a party. The Plaintiff in these bills alleged that there was an excess in the quantity of the land granted by P. to The V. C.C. Company, but did not allege that either that Company or the trustees or creditors, at the time of the conveyance in trust, had any knowledge of any excess, or that The V. C. C. Company, in any way, received or realized anything more for the land than if there had been no such excess, or any other matter that might entitle The V. C. C. Company to recover against any person, whomsoever, or subject its immediate grantee, or any one claiming through him to a rescission or compensation; and did not allege or indicate on the part of The W. M. and M. Company, any election or desire for a rescission, or any readiness to refund any money paid for the land, or to pay for any improvements made thereon. But the Plaintiff alleged a mistake in the deed as to one of the lines—an allegation not sustained—and sought a conveyance of that part of the land granted by the alleged mistake:—Under such circumstances, and after such lapse of time from the sale and conveyance, and from the discovery of the mistake, before the commencement of proceedings, and upon such pleadings, it is not proper to decree a rescission of the sale or conveyance or compensation for excess of quantity.

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peytona Cannel
Coal Co.

24. A grant of land is a mere transfer of such title or right thereto as the grantor, at the time of the grant, may hold or have, absolutely or contingently.

25. A grant does not imply an assertion of title in the grantor, or a covenant with the grantee to warrant the land.

26. A bargain and sale of land, intended, under the statute on the subject, to operate as a present conveyance or transfer, is not an assertion of title that will estop the bargainor, his heirs or assignees, from subsequent assertion of an after acquired title, and does not imply a covenant of warranty.

27. A covenant of special warranty is not intended to bind the covenantor to indemnify the covenantee against eviction or damage by reason of any title or claim not, at the time of the execution of the covenant, in the covenantor or some person acquiring it from or through him.

28. If at the time of the execution of a grant or bargain and sale of land, with a covenant of special warranty, the title to the land be

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peytona Cannel
Coal Co.

in a third person, not because of any act or default of the covenantor, and such person afterwards asserts and enforces the title against the covenantee, the covenant is not thereby broken, and the covenantor is in no way responsible.

29. In such case, if the covenantor, himself, afterwards acquires the title to the land, the title does not, by reason of the special warranty, vest in the covenantee, and the covenantor is not estopped to assert it or grant it to another.

30. If, however, there be false and fraudulent representations as to a material fact, made by the grantor or bargainor, and relied on by the grantee or bargainee, and this be properly brought to the cognizance of a court of equity, it will there be a subject for consideration.

31. When a grantor, having title to a part of a tract of land, but not in fact having title to the residue thereof, covenants to warrant generally a quantity not exceeding that to which he has title, and to warrant specially a quantity equal to or exceeding that to which he has not title, the covenant of general warranty will be construed as applicable to the land to which the covenantor has title, and the covenant of special warranty, to the land to which he has not title.

The opinion of the Court contains a sufficient statement of the case.

The Hon. James W. Hoge, judge of the circuit court of Kanawha county, presided in said circuit court on the 14th day of May, 1872, the date of the rendition of the decree appealed from.

*Thomas L. Broun, William A. Quarrier, Thomas B. Swann* and *Samuel A. Miller* for the appellant.

*James H. Brown, Burlew & DuBois* and *James H. Ferguson* for the appellees.

HOFFMAN, JUDGE:

Voluminous and complicated as is the record of this case, the statement of a few prominent facts extracted from its contents, and the suggestion of a few principles applicable to the subject, will suffice to illustrate and control the decision of the points presented for adjudication.

In the year 1849, William M. Peyton of Virginia 1875. January Term.

Western Mining and Manufacturing Co.

v

Peytona Cannel Coal Co. owned a large tract of land in the County of Boone, on Coal River and Drawdy's Creek, Indian Creek, waters of Laurel Creek, tributaries of that river, and other waters; in the larger parts of which were beds of cannel coal of great value. Drawdy's Creek and Indian Creek arise in the mountains of the country, and run, in the main, north-eastwardly into Coal River. The ridge dividing the waters of Drawdy's Creek, on the one side, from the waters of Indian Creek, waters of Laurel Creek and other waters, on the other side, extends from near Coal River, southwardly, then south-westwardly, and afterwards suddenly changes its direction and extends south-eastwardly, to the head waters of Drawdy's Creek. The tract includes the mouth of Drawdy's Creek, and all the waters of Indian Creek. The lines on the western and north-western sides of the tract, as far as it is important to notice them here, with numerous changes of direction, ran from Coal River, generally southwardly, and crossed Drawdy's Creek, to the point of the ridge already mentioned, and ran on the ridge as far as it has been described. These lines, which were numerous, ran sometimes on one side and sometimes on the other side of the summit of the ridge. The lines on the southwestern side of the tract were those of a grant from the Commonwealth of Virginia to Robert James, Frederick Molineaux and John Pollock, through whom, mediately, Peyton acquired the title to the land. These lines, as far as they need be noticed, ran from a known corner of the tract, according to the calls of the grant, northeastwardly to three maples, three oak saplings and a chestnut, and thence north 39° east, 1,940 poles, to a sugar and large sycamore on the northward side of Joe's Creek. Its actual course, however, (as by a late survey ascertained) was north 41½° east—variant 2½° from the call in the deed.

On the 9th day of February, 1849, an act was passed by the General Assembly of Virginia, incorporating

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peytona Cannel
Coal Co.

Peyton and such other persons as he should associate with him, as The Virginia Cannel Coal Company, for the purpose of mining, raising and transporting coal in the County of Boone and other counties named.

In the year 1850, Peyton caused lines to be run and marked along the ridge dividing Drawdy's Creek from Indian Creek and other waters, nearly corresponding with the lines of the lands to which he then had title : But, as far as is disclosed by the record, he did not cause any other lines to be run that are material in the consideration of this case.

Under that act of the General Assembly, a number of persons, most of them resident in the city of New York, having subscribed stock amounting in the aggregate to one hundred thousand dollars, at a meeting of the subscribers, in New York, on the 25th day of January, 1851, the Company was organized. In the articles then adopted, it was stated that a purchase from Peyton, of 6,000 acres of coal land in the State of Virginia, was contemplated, and that he was to convey to the Company, with warranty, 6,000 acres of coal land, acceptable to the Board of Directors, in kind, quantity and location, with a title perfect and unincumbered ; and the Company were to pay him therefor, in money, $60,000, and in stock subscribed for by him, $90,000—making $150,000 Peyton and others were elected directors, and, it seems, Peyton was elected president. At a meeting of the Directors, on the 27th day of January, at which Peyton presided, the proceedings of the previous meeting were confirmed, and the treasurer was authorized to call on the subscribers to the stock, to pay ten per cent., and to pay to Peyton, on the execution of his bond, $6,000, as earnest money. The proceedings were signed by Peyton, as president.

Peyton returned to Virginia ; and on the 22nd day of March, 1851, obtained two deeds, from different persons, for several tracts, constituting most of the lands on Drawdy's creek, extending to and adjoining the land previous-

ly owned by him, already described; and, on the 24th day of the same month, he caused the deeds to be recorded in the county of Boone. But there remained a comparatively small tract on that creek, extending to the lands of Peyton, for which he did not then obtain a deed.

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peyton Cannel
Coal Co.

On the 31st day of March, 1851, in the county of Roanoke, Peyton made a deed to the Virginia Cannel Coal Company, whereby it was witnessed that, in consideration of five dollars, he granted, bargained, sold, enfeoffed and confirmed to the Company, a tract of land on Big Coal River and some waters thereof, in the county of Boone, containing by survey 6,123 acres, bounded as in the deed is set forth: And he covenanted that he was seised of a good title to 6,000 acres of the land; that he had full power to convey it; that the grantee should have quiet possession thereof; and that he, the grantor, would warrant generally that quantity: And he covenanted that he would warrant specially the surplus of 123 acres. And, on the day of its date, he acknowledged the deed for recordation.

The courses and distances of the different lines, as described in this deed, from the point of the ridge dividing Drawdy's Creek from Indian Creek, to a chestnut oak in a patch of rocks, run on the ridge, and do not vary materially from the lines and corners found marked. From the chestnut oak at a patch of rocks, the course and distance mentioned in the deed, is south 34° west, 1,030 poles. This course runs considerably north-west of the top of the ridge and the lines and corners marked thereon, and crosses Drawdy's Creek twice, at a sharp bend thereof, and crosses a number of branches of that creek. The line includes in the tract granted considerable parts of the two tracts for which Peyton procured deeds to be executed on the 22nd day of March, 1851, and about one hundred acres, or, perhaps less, part of a tract lying between the two just mentioned, for which Peyton did not obtain a deed till afterwards.

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peytona Cannel
Coal Co.

Generally, when in a deed lines or corners are described, or when, from the statement of courses and distances or other descriptions, in connection with circumstances existing and manifest or ascertainable at the time of the execution of the deed, it is presumable that such lines or corners are those referred to in the deed, the statement of courses and distances is, in construction, controlled by the actual lines and corners referred to. But the mere circumstance that lines and corners are known to have been run and marked, or are found marked near where courses and distances mentioned in the deed run, is by no means conclusive that these are the lines and corners of the land in the deed referred to: And when there is no such approximation in the courses or length of the lines, or the marks on the corners, to the description in the deed, as to warrant the presumption that they are the boundaries of the land to which the deed relates, such marked lines and corners should be disregarded.

Often, lines and corners are marked with the purpose, more or less definite, to adopt them in a contemplated deed, but afterwards such purpose is abandoned, and mere course and distance from some certain object or point are substituted: And, often, lines and corners are found marked without any reason ascertainable by persons against whose interest their existence is urged.

In this case, the lines marked on the ridge are numerous, short, and variant in course; and corners are marked at their termini. None of them correspond in course, or approximate a correspondence in length, to the line described in the deed. That line is long and straight, and no corner is mentioned at its terminus. It runs, at one place, as much as three hundred poles from the marked lines on the ridge, and, in the average, half that distance from those lines. The course and distance mentioned in the deed must be construed to furnish the line of the land granted.

From the termination of the distance of this line, the course and distance mentioned in the deed as that of the next line, would not reach what, as will be seen, is considered the actual corner of the land; but an extension of the long line south 34° west 1,030 poles, to the distance of 101 poles beyond that point, would reach a point on the ridge, from which the course of the next line, as mentioned in the deed, south 44° east 533 poles, extended a distance of 31 poles, would reach the next corner. The extension of the long line to the point just mentioned would make the tract approximate more nearly to a rectangular form, but would not make any material change in this respect. At the termination of the extension of this line suggested, on the ridge, no course or line is found, and the line thence is not marked, and is not a line of the land owned by the grantor.

1875.
January Term.

Western Mining
and Manufacturing Co.
v.
Peytona Cannel
Coal Co.

There is no uniform rule that the length of one line, as mentioned in a deed, shall control the course of another line, or that the latter shall control the former. Other circumstances will determine the adoption of the one or the other. Though the quantity of the land mentioned in the deed will not control the boundary when this is ascertained by the description with other paramount circumstances, nevertheless, the correspondence of quantity given by a line in question, with the quantity mentioned, or an approximation to such correspondence, may be considered; and where no other relevant circumstances appear, or when other such circumstances are equipollent, the correspondence of quantity will determine the establishment of the one rather than the other line.

In this case, there is nothing sufficient to extend the line running south 34° west, beyond the distance mentioned, 1,030 poles; while the termination of the line at the end of that distance will make the quantity approximate more nearly to that estimated, than the extension of this line to the top of the ridge, and the adoption of the line thence would do.

53*

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peytona Cannel
Coal Co.

The course and distance of the next line, and the next corner, as mentioned in the deed, are south 44° east, 533 poles to three maples, two oaks and a chestnut. On this course and at the end of this distance, no line or course is found marked. To run from the termination of this distance, the course and distance of the next line, would leave a strip between the line of the land owned by Peyton and the land granted by the deed, about fifty poles wide at one end and a hundred poles wide at the other end, and fourteen hundred poles long. But a line from the termination of the line south 34° west, 1,030 poles, run south 34° east 562 poles—variant 10° from, and longer by 19 poles than the description—will reach the corner of the land owned by the grantor, at a point where, in the original grant under which he claims, the three maples, the three oak saplings and a chestnut, before alluded to, were described—though it does not appear that they remained standing when the deed was made. And the next line mentioned in the deed runs the course of the land owned by the grantor, as described in the original patent. This line is marked, though, in fact, it runs, according to the meridian recognized at the time the deed was made, north 41½° east—2½° variant from the course mentioned in the original patent and the deed from Peyton to The Virginia Cannel Coal Company.

Generally, in the absence of facts or circumstances explanatory, it will not be presumed that a party granting land intends to retain a long narrow strip next to one of his lines; but if the courses and distances approximate closely to a line or corner of the tract owned by the grantor—especially if the description in the deed corresponds, exactly or substantially, with the description in the title papers under which the land is held—it will be presumed that the lines mentioned are intended to reach the corners and run with the lines of the tract, though the trees marked and described have disappeared before the making of the deed.

For the reasons stated, the line suggested, south 34°
east 562 poles to the corner of the land granted by the
Commonwealth to James, Molineaux and Pollock, is
considered the true line of the land granted by Peyton
to The Virginia Cannel Coal Company.

1875.
January Term..
Western Mining
and Manufac-
turing Co.
v.
Peytona Cannel
Coal Co.

As has been indicated, the line described as north 39°
east, runs, in fact, with the line of the land granted by
the Commonwealth to James, Molineaux and Pollock,
and at the end of the distance, 1,406 poles, terminates.
This termination of the line will make the quantity in-
cluded less, and more nearly approximate to the quan-
tity estimated, than would the extension of the distance
to a point from which the course of the next line and
the distance extended, would reach the white oak and
sassafras, corner to Toney's survey—as to the location
of which the parties agree. The course of this line
mentioned in the deed, has to be varied about 7°, and
extended about 90 poles, so that the line runs about
north 20° west, 759 poles.—The former line properly
terminates at the end of the distance mentioned, and
the next line runs from that termination to Toney's
corner.

The other lines of the tract have not been the subject
of controversy in any form.

Although, in the deed, the land is described as contain-
ing, by survey, 6,123 acres, yet as far as from the record
is ascertainable, a number of the lines of the tract were
never marked, measured or run, till the year 1860.

By the boundaries of the deed, legally construed and
applied to the manifestations on the land and the history
of the title, though the true courses and length of some
of the lines were not known at the time, or ascertained
for years afterwards, the actual quantity of the land
granted was about 6,973 acres—about 850 acres more
than was estimated at the time of the grant.

At a meeting of the directors of the Company, in
New York, on the 25th day of April, 1851, Peyton pre--

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peytona Cannel
Coal Co.

sented the deed, with the understanding that the surplus of 123 acres was a gift, and it was resolved that the title to the land was satisfactory to the board: And at a meeting of the subscribers of the Company, on the 28th day of the same month, it was resolved that the title to the land should be accepted: And at a meeting of the directors on the 6th day of May, 1851, it was recited that the title to the land had been examined and was accepted; and it was ordered that the treasurer should pay to Peyton the balance of $30,000, not previously paid; that the secretary should order bonds of the company to be prepared, for the sum of $30,000, and that these should be executed and delivered to Peyton; that the president and secretary should issue to Peyton certificates for nine hundred shares of the twenty-four hundred shares of the stock of the company, and that Peyton should file a receipt in full for the cash, bonds and stock.

The consideration for the land was, by the company, paid in full to Peyton.

And on the 25th day of June, 1851, the deed was admitted to record in the county of Boone.

At a meeting of the stockholders of the company, in New York, on the 3d day of May, 1852, directors were elected, and Peyton was left off the board; and at a meeting of the directors, at the same place, on the same day, Henry A. DuBois was elected President.

Peyton had made some openings in the land sold, and mined and removed coal therefrom before the sale. And, in the year 1852, DuBois, the new president of the company, went on the land, and the company, through his agency, repaired and improved the mines and worked them. The company likewise contributed largely to the improvement of the navigation of Coal River, in order to the transportation of coal from the land.

On the 14th day of March, 1853, an act was passed by the General Assembly of Virginia, incorporating Pey-

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peyton.a Cannel
Coal Co

ton and such other persons as should be associated with him, as The Western Mining and Manufacturing Company, for the purpose of mining and manufacturing minerals and other substances in the county of Boone and another county.

In the year 1854, the subscribers to the stock of The Western Mining and Manufacturing Company organized that company, and elected directors. Peyton was a subscriber to the stock, and was elected a director.

On the 12th day of December, 1854, William M. Peyton made a deed to Edwin Mitchell and Jesse E. Peyton, whereby it was witnessed that, in consideration of one dollar paid, William M. Peyton granted, bargained, sold, aliened, released and confirmed to Mitchell and Jesse E. Peyton, a tract of land on Drawdy's Creek, beginning at a corner of the tract of The Virginia Cannel Coal Company, near the falls of the creek, about a mile from its mouth, and running southward, with the lines of that tract, to a point mentioned, but not very distinctly designated, which is some place near the southern part of the tract granted by Peyton to The Virginia Cannel Coal Company, and extending, by boundaries generally described, westward and northward; not, however, mentioning any quantity: And Wm. M. Peyton covenanted that he would warrant the land specially. On the 14th day of April, 1857, this deed was recorded.

This grant was in fact for the benefit of The Western Mining and Manufacturing Company.

The tract included the two tracts granted on the 22d day of March, 1851, one by Benjamin Byrnside and the other by Rachel Williams to William M. Peyton, and a tract lying between them, owned by Tetham Snodgrass, a part of which, however, was by the deed dated the 31st day of March, 1851, granted by Peyton to The Virginia Cannel Coal Company.

The land, it seems, contains large quantities of cannel coal, and other coal, apparent on both sides of Drawdy's Creek, at different points, from near the lower end to near the upper end of the tract.

On the 16th day of July, 1855, Tetham Snodgrass made a deed to William M. Peyton, whereby the former granted to the latter a tract of land on Drawdy's Creek, between the two tracts granted to Peyton on the 22d day of March, 1851, extending south-eastwardly to the land formerly owned by Peyton, and including the part not before owned by him, though granted by him to The Virginia Cannel Coal Company.

On the 18th day of December, 1855, The Virginia Cannel Coal Company made a deed to The Western Mining and Manufacturing Company, whereby it was witnessed that in consideration of $1,280 paid, the former company granted, bargained and sold to the latter, a tract of land—part of the land granted by Peyton to that company—on the south side of Coal River, including the mouth of Drawdy's Creek, and extending up that creek to the line between the land granted by Peyton to The Virginia Cannel Coal Company and the land granted by him to Mitchell and Jesse E. Peyton.

On the 6th day of January, 1857, William M. Peyton made another deed to Mitchell and Jesse E. Peyton, whereby it was witnessed that, in consideration of one dollar paid, and other valuable considerations, William M. Peyton granted to Mitchell and Jesse E. Peyton, all his right, title and interest, legal and equitable, to and in six tracts of land on Drawdy's Creek, including nearly all the land thereon. This deed comprehends most of the lands already mentioned for which Peyton obtained deeds on the 22nd day of March, 1851, and the land not owned by him when he made the deed to The Virginia Cannel Coal Company on the 31st day of March, 1851, but for which he obtained a deed on the 16th day of July, 1855. The lines set forth in the deed vary somewhat, but not widely, from the lines caused by Peyton to be run on the ridge in 1851. The deed contains reservations and exceptions not important to be noticed in this case. The grantor covenanted that he would warrant the land generally, and that the grantees

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peytona Cannel
Coal Co.

should have quiet possession thereof, free from incumbrance.

On the 7th day of October, 1857, Mitchell and Jesse E. Peyton made a deed to The Western Mining and Manufacturing Company, whereby it was witnessed that, in consideration of $12,500 paid, and for other causes, Mitchell and Jesse E. Peyton granted to The Western Mining and Manufacturing Company the same lands with the like reservations: And Mitchell and Jesse E. Peyton covenanted that they would warrant the land specially.

In the year 1853, Du Bois, the president of The Virginia Cannel Coal Company, left the land owned by that Company, and in 1854 went to Europe in the interest of the Company; and he did not return till late in the year 1858. In the year 1854, Clement Smith, as agent of the Company, came to the land, and he remained there. In May, 1859, he was elected president, and he continued such till the dissolution of the company.

In the year 1852, and thereafter for a number of years, that company opened mines on the land east of the ridge between Drawdy's Creek and Indian Creek, and nearly north about one hundred poles from the chestnut oak at the patch of rocks, and made large and valuable improvements for the mining and transportation of coal, and subscribed large sums to the stock of The Coal River Navigation Company, organized to improve the facilities for the transportation of coal from the lands of this and other companies, to the markets on the Ohio and Mississippi Rivers.

In the year 1855, The Western Mining and Manufacturing Company commenced the construction of a railroad from Coal River, up the valley of Drawdy's Creek; and, in the year 1856, made an opening, south-west, about one hundred poles, from the chestnut oak corner in the patch of rocks, and about eighty poles north-west from the line protracted from the chestnut oak south 34° west; and the company made another opening,

1875.
January Term

Western Mining
and Manufac-
turing Co.

v.

Peytona Cannel
Coal Co.

perhaps one hundred and twenty poles south-west from the chestnut oak, and five poles north-west from the line therefrom just mentioned. And, through this opening, The Western Mining and Manufacturing Company made its drafts underground across the latter line into the land of the Virginia Cannel Coal Company, and removed therefrom large quantities of cannel coal: And The Western Mining and Manufacturing Company, at large cost, constructed its railroad through its own land from Coal River to the first of these openings; and erected dwelling houses, store houses, mills and other structures on its land; and subscribed large sums to the stock of The Coal River Navigation Company, in order to promote and facilitate the mining and transportation of coal from the land claimed by it, already described. This company, likewise, cut timber on the land granted by Peyton to The Virginia Cannel Coal Company, between the long line south 34° west, and the top of the ridge.

It seems that Smith did not know what the calls of the deed to The Virginia Cannel Coal Company were, and if he had known this, he did not know where the line south 34° west would run with reference to the top of the ridge; but, without special attention to the subject, from the acts and information of agents of The Western Mining and Manufacturing Company, he supposed the ridge was the line between the lands of the different companies.

Late in the year 1858, Du Bois returned to the land of The Virginia Cannel Coal Company. He had previously obtained some general information as to the boundary of the land; and when he returned and observed the operations of The Western Mining and Manufacturing Company, he supposed that company had encroached and was operating on the land of The Virginia Cannel Coal Company: And, consequently, in 1859, he caused a copy of the deed from Peyton to the company to be obtained, and a partial survey to be made, which

demonstrated the truth of his apprehensions. And early in the year 1860, The Virginia Cannel Coal Company instituted an action of ejectment against The Western Mining and Manufacturing Company, or its tenants.

1875.
January Term.

Western Mining and Manufacturing Co.
v.
Peytona Cannel Coal Co.

On the 6th day of September, 1859, The Virginia Cannel Coal Company made a deed to Walter C. Smith and Thomas L. Broun, trustees, whereby it was recited that the company was largely indebted to certain persons, and was anxious to secure the payment of all its indebtedness; and it was witnessed, that the company granted to the trustees the tract of land on and near Big Coal River, stated to contain 6,000 acres, more or less—describing the land as it was described in the deed from Peyton to the company (exclusive of 128 acres conveyed by that company to The Western Mining and Manufacturing Company;) and granted to the trustees 861 shares of stock, of twenty-five dollars each, in The Coal River Navigation Company; in trust to secure a number of several debts to a number of different persons, previously contracted and remaining unpaid; amounting, in the aggregate, to $55,931.25 cents. Among these creditors were DuBois and Clement Smith, who were stockholders in The Virginia Cannel Coal Company; but a number of the persons thus secured, as far as appears by the record, were not such stockholders. On the 7th day of September, 1859, the deed was admitted to record.

Early in March, 1860, under an order in the action of ejectment, a survey was made by John L. Cole, surveyor, superintended by counsel for The Virginia Cannel Coal Company, and an agent of The Western Mining and Manufacturing Company, when, for the first time, as far as the record discloses, the parties ascertained the actual courses and distances of the lines across the ends of the tract granted by Peyton to the former company, the prolongation of which, beyond what at the time of the execution of the deed was supposed to be

54*

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peytona Cannel
Coal Co.

their length, occasions the excess in the quantity of the tract, above what was then estimated.

On the 25th day of September, 1865, Smith and Broun, the trustees in the deed made by The Virginia Cannel Coal Company to secure creditors, according to the provisions of the deed, sold and granted to John B. Storm of New York, at the price of $85,000, the tract of land, described as containing 6,000 acres more or less, exclusive of the 128 acres—and as the tract containing 6,123 acres conveyed by Peyton to that company and by that company to the trustees—and the 861 shares of stock in The Coal River Navigation Company. It seems, however, that Storm, in fact, acted for persons who paid the purchase money, and to whom the land was by him afterwards conveyed, as will be stated.

On the 2nd day of December, 1865, William M. Peyton, Mitchell and Jesse E. Peyton made a deed to The Western Mining and Manufacturing Company, whereby William M. Peyton granted to that Company all his right, title and interest to the excess of land conveyed, in mistake, by him to The Virginia Cannel Coal Company.

On the 23d day of December, 1865, Storm made a deed to William H. Aspinwall, Henry E. Pierrepont, William A. White, Abriel A. Lowe, Edgar S. Van Winkle, Charles N. Emerson, Cornelius DuBois, John R. Ackerman, George W. Coster, Clement Smith, Charles M. Connally, Joseph B. Vandervort and William McDonneaugh, whereby it was witnessed that in consideration of the sum of $85,000, Storm granted to the other parties mentioned, the tract of land purchased by him and granted by Smith and Broun to him, as has been stated— undivided interests therein to be held by the grantees in proportion to the different parts of the purchase money paid by them, the respective amounts of which are in the deed set forth.

On the 24th day of March, 1866, The Western Mining and Manufacturing Company caused the summons

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v
Peytona Cannel
Coal Co.

in this case to be issued—which was not served; and in April, 1866, an order of publication was entered, in which it was stated that the object of the suit was to correct a mistake in the deed made by Peyton to The Virginia Cannel Coal Company, dated the 31st day of March, 1851, so far as it conflicted with the deed made by Peyton to Mitchell and Jesse E. Peyton, and so far as the boundaries of the first mentioned deed included more than 6,123 acres of land.

And in May in the same year, The Western Mining and Manufacturing Company filed the original bill; in which the plaintiff alleged that there was an excess of quantity in the land granted by Peyton to The Virginia Cannel Coal Company, over what was estimated; that William M. Peyton, Mitchell and Jesse E. Peyton conveyed to the plaintiff the right, title and interest of the former in and to the excess; that The Virginia Cannel Coal Company quietly stood by and allowed The Western Mining and Manufacturing Company to make vast expenditures: And the Plaintiff prayed that William M. Peyton, Mitchell, Jesse E. Peyton and The Virginia Cannel Coal Company be made defendants; and that the ridge be established as the line between the parties; or that The Virginia Cannel Coal Company be required to pay the Plaintiff for the excess of the land conveyed, above 6,123 acres, and the moneys which that company induced the Plaintiff to expend on its own land and on that of The Virginia Cannel Coal Company.

It would seem that in the summer of 1867, The Western Mining and Manufacturing Company prepared an amended bill, in which the Plaintiff alleged that the true line on the south-east side of the tract granted by Peyton to The Virginia Cannel Coal Company, was the line on the south-east side of the tract granted by the Commonwealth to Molineaux, James and Pollock—called the James line; and made The Virginia Cannel Coal Company, The Peytona Cannel Coal Company, William M. Peyton, Mitchell, and Jesse E. Peyton defendants; and

prayed that the court compel The Virginia Cannel Coal Company to take and hold the tract of 6,123 acres, extending in width from the south-east side of the tract owned by Peyton at the time of his sale and conveyance to The Virginia Cannel Coal Company, north-westwardly, so as to exclude the land between the line of the ridge and the straight line south 34° west, 1,030 poles.

On the 1st day of April, 1869, William H. Aspinwall, Henry E. Pierrepont and Henry A. DuBois made a deed to The Peytona Cannel Coal Company whereby it was witnessed that the three persons mentioned, granted to the company mentioned three thousand acres of the tract formerly owned by The Virginia Cannel Coal Company, and by that company granted to Smith and Broun, trustees, and by them to Aspinwall and others—but the quantity was not set apart.

In February, 1871, the Plaintiffs filed a supplemental bill, in which they allege that since the filing of the original bill, The Peytona Cannel Coal Company has become the owner of the 6,123 acres of land, less the 128 acres formerly owned by The Virginia Cannel Coal Company; and the Plaintiffs assert that the sale was by the acre, and that the company is entitled to compensation from The Peytona Cannel Coal Company for every acre in the tract over 6,123 acres; and pray that the latter company should be required to pay at the rate of twenty-five dollars per acre, with interest, for the excess; and that, besides the parties previously mentioned, The Peytona Cannel Coal Company be made a party.

In some way—but it does not appear how—The Philadelphia Cannel Coal Company became the successor of The Western Mining and Manufacturing Company; and became a plaintiff.

The Western Mining and Manufacturing Company filed a bill for an injunction to stay waste, and filed a number of amendments to its bills; Peyton filed a cross bill; The Western Mining and Manufacturing Company and The Philadelphia Cannel Coal Company filed a

number of supplemental bills and bills of review, or bills in the nature of bills of review; the Defendants, or most of them, filed answers to these various bills, or the more important of them; the Plaintiffs replied, sometimes specially and sometimes generally; the parties filed voluminous exhibits; took and retook elaborate depositions, filed exceptions, and had surveys made; and the Court made numerous orders and decrees;—a detailed statement of which is not here important.

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peyton's Cannel
Coal Co.

The Plaintiffs urge, as the gravamen of their case, that Peyton, by mistake, instead of a description that would have made the boundary on the north-west side of the land granted by him to The Virginia Cannel Coal Company, to run with the ridge, inserted the straight line south 34° west 1,030 poles.

A writing solemnly signed, sealed, and acknowledged before a magistrate, and delivered, by a person, is evidence of his intent, so convincing and conclusive, that at common law, generally, no evidence will be received to contradict it. In a court of equity however, it may sometimes be proved that a deed was executed in mistake, and that, in fact, it embodies provisions different from those which the parties intended. But, even in this court, the deed is regarded as evidence so strong, that only other unequivocal evidence irresistibly conclusive, is sufficient to overthrow it.

In this case, there is testimony tending to prove that when Peyton executed the deed to The Virginia Cannel Coal Company, dated the 31st day of March, 1851, he intended to incorporate in it such description as would make the previously marked lines and corners on the ridge between Indian Creek, waters of Laurel Creek and other waters, on the one side, and waters of Drawdy's Creek, on the other side, the boundary on the north-west of the land granted: But, on the other hand, there is testimony of witnesses, equally persuasive, if not more convincing, that for a reason stated by Peyton, he deliberately and intentionally discarded the lines and

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peytona Cannel
Coal Co.

corners run and marked, from the chestnut oak in a patch of rocks, with the ridge, south-westwardly, and adopted the straight line, south 34° west 1,030 poles. To set forth and comment on the evidence on this subject,. would be not only wearisome, but unprofitable. It may, however, be worth while to mention a few circumstances, as to which there is no controversy, that are forcibly suggestive, if together they are not absolutely conclusive, on the subject.

Peyton, at a time when he seems to have been especially occupied in the great work of organizing The Virginia Cannel Coal Company, and completing the sale to that company of the land in question, when he had come from New York to do all that was necessary to be done in Virginia, tending to the accomplishment of that object, and at a season of the year when travel in the mountainous sections of the State was by no means agreeable or convenient, caused an agent, on the 22d day of March, 1851, to obtain from Richard Williams and Benjamin Byrnside, deeds for the two tracts of land already mentioned on Drawdy's Creek, including most of the land between the top of the ridge and the straight line south 34° west; and to go on horseback and take the deeds to the court house of the county of Boone, and on the 24th of the month have the deeds admitted to record, and await their recordation, and to take them to Peyton at Charleston; and on the 31st of the same month, in the county of Roanoke, Peyton executed and acknowleged the deed to The Virginia Cannel Coal Company.

It seems that, from the chestnut oak at the patch of rocks there were not less than eight successive lines and corners marked on the ridge. This number of corners was found as late as 1858. The straight line south 34° west, runs some hundreds of poles from some of these lines and corners.

Evidently, Peyton—or whoever acted for him as draughtsman of the deed—had before him the notes of the

survey made in 1850, in which the lines and corners marked on the ridge were set forth. The actual lines and corners from the point of the ridge near the creek, to the chestnut oak in a patch of rocks, as they were set forth in the notes, and are found on the ground, with slight variations, such as are common, were adopted in the deed; but from that point, the lines and corners marked are discarded, and the line south 34° east 1,030 poles, terminating at no object, is adopted.. Peyton was a man of superior intelligence and business capacity, and a practical surveyor. It is inconceivable that he should discard the marked lines and corners before him, and adopt the course and distance, so entirely different, unless he intended the latter to be the line of the land he granted. No mistake as to this matter is at all plausibly explained.

Indian Creek and the other waters on the south-east side of the ridge were mentioned in the notes of boundaries in Peyton's possession, and these streams were probably familiar to him personally. If he had intended to confine the grant to the land on that side of the ridge, he would naturally have mentioned those waters by their names. But, when he adopted the long straight mathematical line, he might well be in doubt as to what waters it would cross. In that case, he would not wish to mention waters that the boundaries might not reach; and, on the other hand, he would not wish to mention only a part of the waters and omit others of equal importance, which the boundaries might reach, and so negatively indicate that the boundaries would not reach them. Avoiding this dilemma, the grantor simply described the land as on Big Coal River and some of the waters thereof.

The courses and distances of lines, as they are understood at the time when a calculation of quantity is made, furnish the basis of the calculation. The same courses and distances employed in the calculation are inserted in the deed—though, in fact, they may be controlled and varied by marked corners called for, or other

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peytona Cannel
Coal Co.

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peytona Cannel
Coal Co.

facts outside of the deed not then known—when they are ascertained. The courses and distances, supposed to have been deemed correct when the deed from Peyton to The Virginia Cannel Coal Company was prepared, and therefore inserted in the deed, are, upon calculation, found to give the quantity mentioned in the deed—as nearly as two different calculations of quantity generally approximate the like result. If the other boundaries then supposed to be correct, and, with them, the various lines on the ridge, were then calculated, they did not indicate more than about five thousand acres within their limits—a thousand acres less than Peyton was bound to furnish, in order to effect his purpose ; and manifestly it at once appeared to him, that he must add about a thousand acres on the side of the ridge next to Drawdy's Creek, or elsewhere, in order to accomplish his great and cherished object. As we see, he did discard the lines on the ridge and adopted a line that included the quantity stipulated for, and something more, the conclusion is very strong that he intended to do what, in fact, he did do. The subsequent discovery that Peyton was mistaken as to the actual width of the tract at each end, and that consequently his estimate did not reach the actual quantity in the tract as afterwards ascertained, does not influence the presumption as to what, at the time of the execution of the deed, he intended.

There is, then, clearly, no sufficient proof of mistake in the call in the deed, for the line from the chestnut oak in a patch of rocks, south 34° west 1,030 poles, to induce the action of a court of equity.

The Plaintiffs attach much importance to the action of Peyton after his grant to The Virginia Cannel Coal Company.

A stockholder in an incorporated company is not so jointly interested with the other stockholders, or so identified with the corporation, that his unauthorized and unwarranted acts will be deemed theirs, or in any manner bind them, to their detriment.

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peytona Cannel
Coal Co.

It scarcely need be remarked that after Peyton's conveyance to The Virginia Cannel Coal Company, his dominion over the land ceased, unless as the agent of that company it was continued or revived. If, in 1854, when Peyton made the deed to Mitchell, and Jesse E. Peyton, for the benefit of The Western Mining and Manufacturing Company, he remained a stockholder in The Virginia Cannel Coal Company, he was nothing more. He had no authority, by his acts, declarations or acquiescence, to bind the former company. On the other hand, he was a stockholder and director in The Western Mining and Manufacturing Company :—Though this is not deemed important.

The Plaintiffs urge that the acts, admissions and statements of The Virginia Cannel Coal Company, by its agents, indicating that the land of The Western Mining and Manufacturing Company extended to the top of the ridge already so often mentioned, constituted fraud, and estopped The Virginia Cannel Coal Company from afterwards asserting and enforcing their title, to the true mathematical boundary.

It is not the duty of the owner of one tract of land to ascertain its boundary for the information of the owner of a coterminous tract, who, without himself ascertaining the boundary, projects and constructs improvements on the other's tract, or on his own, in order to the better development of the former tract. The failure of the owner of the land to obtain and communicate such information is neither actual fraud nor culpable negligence. If, under a mistake as to the true boundary, one such owner speaks of a part of his land, or treats it, as the land of the other, or acquiesces in acts of ownership by the latter over the land, this will not prejudice the title or right of the former, further than, under certain circumstances and upon proper proceedings, to create, and subject the land to, a lien for permanent improvements made thereon, above the value of the use of the land ; or to subject the title and possession to the opera-

55*

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peyton Cannel
Coal Co.

tion of actual adverse possession continued long enough, under the statute of limitations, to bar an action of ejectment. Certainly such innocent, though erroneous statement or act made to or done in the presence of the owner of coterminous lands, without any purpose to deceive, and not principally, if at all, relied on by the other as the evidence of boundary, can not render the party so speaking or acting, in any manner liable, in equity, to the forfeiture of his own land, or the payment of money to indemnify the owner of the adjoining land for improvements he may have made on it, or for expenditures he may have made elsewhere, in order to facilitate and enhance the use and value of the land owned by the other, as to the boundary of which the mistake has existed. The statements, acts or acquiescence of the owner or claimant of land, are generally evidence against him, under all the circumstances, more or less forcible: But, unless they are accompanied by actual fraud or culpable negligence, tantamount to actual fraud, and are relied on by another as the foundation of material action or acquiescence on his part, they do not estop the owner of the land from asserting and proving his title or boundary.

As we have seen, the land between the ridge and the straight line from the chestnut oak at the patch of rocks, was unquestionably owned by The Virginia Cannel Coal Company, though claimed, at first equitably but afterwards legally, through Mitchell and Jesse E. Peyton, by The Western Mining and Manufacturing Company.

The stockholders in The Virginia Cannel Coal Company were residents of distant States. Clement Smith was managing agent of the Company, during the years from 1855 to 1859, during a part of which period The Western Mining and Manufacturing Company made most of the expenditures that they claim to have made principally for the development of the land owned by The Virginia Cannel Coal Company, and claimed by The Western Mining and Manufacturing Company. The

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peytona Cannel.
Coal Co.

openings and the operations of The Virginia Cannel Coal Company were on that part of its land which was in fact separated from the land of The Western Mining and Manufacturing Company, by lines on the ridge, from the point thereof near the falls of Drawdy's Creek, to the chestnut oak in a patch of rocks. As far as the agents and employees of that company superintending and engaged in its operations, by reason of that agency or employment had occasion to look, the lines on the ridge were the true lines of that company's land. The openings made by The Western Mining and Manufacturing Company were not far south-west of these lines, and were on its own land. If the scope of Smith's agency extended to the ascertainment and determination of the boundary of the land south-westwardly from the chestnut oak in a patch of rocks, or the communication of facts on that subject to the directors of The Western Mining and Manufacturing Company—as to which it is not now necessary to enquire—he had no knowledge or information that suggested the importance or propriety of an investigation as to such boundary. He testifies that the agents of The Western Mining and Manufacturing Company informed him that the line ran with the ridge, and he did not suppose they misrepresented the facts or that the latter company claimed land that it did not own. He had not seen the deed from Peyton to The Virginia Cannel Coal Company, and the line from the chestnut oak at the patch of rocks south 34° west had not been run. The evidence, generally, sustains Smith's testimony on this subject, and enforces the conviction, that, while he was under no obligation to The Western Mining and Manufacturing Company to ascertain the fact, he did not know where the true boundary of The Virginia Cannel Coal Company's land actually fell on the ground.

On the other hand, the deed from Peyton to The Virginia Cannel Coal Company was prior to the first deed from him to Mitchell and Jesse E. Peyton for the bene-

fit of The Western Mining and Manufacturing Company, and was recorded. The deed to them called for the lines of the land of The Virginia Cannel Coal Company, as the eastern boundary of the land granted to the trustees, and contained no other description by which these lines could be ascertained. Peyton, who made both deeds, was the organizer and a stockholder and director of The Western Mining and Manufacturing Company. If that company failed to examine the deed to The Virginia Cannel Coal Company, which furnished, at least in part, the boundaries of its own land, and Peyton, who a few years before had known, if he did not then remember, all about the matter, failed to inform his own· company properly on the subject, certainly that company ought not to complain that The Virginia Cannel Coal Company or Clement Smith did not obtain and furnish it with accurate information on the subject.

The Plaintiffs have assumed that the land granted by Peyton to Mitchell and Jesse E. Peyton for the benefit of The Western Mining and Manufacturing Company, outside of the true boundary of the land owned by The Virginia Cannel Coal Company, contains but little valuable coal, and that the prospective transportation of what it did contain, was no considerable inducement to, and promised no indemnity for, the expenditures incurred in the improvement of Coal River, the purchase of the 128 acres, and the construction of the railroad as far as it was completed. But the reports of the two geologists, published by The Western Mining and Manufacturing Company, with maps, indicate much cannel coal and large quantities of excellent bituminous coal at different places outside of the long mathematical line of The Virginia Cannel Coal Company's land, on both sides of Drawdy's Creek, and indicate that a railroad was projected to run many hundred poles above the opening to which it was constructed, to a point where fine beds of coal were found, perhaps two hundred poles from the line just mentioned, and that a branch of the railroad

was projected to cross Drawdy's Creek to beds of coal on the western side of that stream.

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peytona Cannel
Coal Co.

Though the Plaintiffs have not urged a mistake in quantity, otherwise than as occasioned by the alleged mistake as to the line south 34° west 1,030 poles, and indicate that no decree that will not give them, or one of them, the land between that line and the marked lines on the ridge, is at all desirable; nevertheless, it may be proper to consider whether there was such a mistake as to the quantity of the tract granted by Peyton to The Virginia Cannel Coal Company as entitled him or his assignee to relief,and if so, whether, by change of circumstances or lapse of time, the right was extinguished or the remedy to enforce it was barred, before he or his assignee properly asserted the right and sought redress.

It is settled, in Virginia and West Virginia, that when a person has sold and conveyed a tract of land, described as containing a definite quantity, at a specified price, it is presumed that the estimated quantity was believed to be substantially correct—within five per cent of exact accuracy ; that it constituted a material element in the determination of the price ; and that, unless it appear that considerable uncertainty or actual risk as to the quantity was contemplated or intended ; if in fact the quantity is afterwards ascertained to be materially less, and the purchaser properly asserts his right in a reasonable time and under reasonable circumstances, a court of equity will grant him relief. Though the sale be not by the acre, but by the tract in gross, this nevertheless is now the rule of decision. But in many—perhaps most cases of sales by trustees and other fiduciaries or officers, it may be different. This, however, it is not necessary now to determine.

It has not been decided by any court, as far as I am informed, that when there has been such a sale and conveyance as has just been described, and subsequently an excess of quantity is discovered, the vendor is entitled to relief. It would seem however that, if upon no high-

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
.Peytona Canı el
Coal Co.

er principle, at any rate on that of mutuality of right between the vendor and the vendee, the former as well as the latter should have redress.

It is not overlooked, that, in more cases than one, it has been held that a vendor of an estimated quantity of land, by the acre, is entitled to compensation for an actual excess. But in such a case, though the estimated quantity is mentioned, the substance of the contract is that the vendor sells the tract, and the purchaser agrees .to give the price stipulated for each acre—no matter how many acres there may be. The redress, then, is a mere .specific execution of the contract.

When, however, the vendor has sold and conveyed an .entire tract of land, and the purchaser, according to the .agreement, has paid the whole purchase money stipulated to be paid for the entire tract, though the parties act in mutual mistake as to the quantity of the tract, the ·question as to the character of the redress which the vendor may have, or the vendee may elect to substitute, is much more difficult of determination. If the vendor ·owned a larger tract of land, and caused part of it to be .surveyed into a smaller tract, and sold this for a fixed price, though both parties had supposed the land sold to constitute the whole tract, the court could not compel the purchaser to take land which he did not buy, and pay for it money which he did not agree to pay. And, as it would seem, for a stronger reason, when the purchaser does not get any land that he did not buy, the ·court cannot compel him to pay for land that he did purchase at a fixed price, which he has paid, an addition-·al sum that he did not agree to pay. It is generally difficult enough for persons to pay the moneys they contemplate and contract to pay: It would be too often ·disastrous, without an agreement, and for no fault of theirs, to compel purchasers unconditionally to pay more.

But, because the parties have acted in material mistake as to the quantity that the tract of land sold con-

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peytona Cannel
Coal Co.

tained, and so the vendor has agreed to take for the tract a price that, if he had known the quantity, he would not have taken; when there are no sufficient counteracting circumstances, the court will rescind the contract, unless the purchaser will voluntarily do what appears to be just. And the vendor having sold and conveyed the entire tract, supposed however to contain a less quantity mentioned, for a less price than if he had known the actual quantity he would have taken, and so having conferred on the purchaser an absolute estate at law, the former should be content to receive such additional sum as, with the sum already paid, or agreed to be paid, would make what, according to the estimated quantity and price, would have been payable for the whole quantity of the tract, as subsequently ascertained. And, as a conclusion from what has been said on this subject, the purchaser ought to have the option whether he will submit to a rescission of the sale or conveyance, or pay the additional proportionate price for the excess of quantity. But, inasmuch as the vendor's primary right is to a rescission, subject however to the qualification just stated, it would seem that, when, by his act or negligence, or without the fault of the purchaser, the vendor's right to a rescission is destroyed or extinguished, he can no longer be entitled to compensation against the purchaser. Though, perhaps, if it should clearly appear, that the bargain was so advantageous to the purchaser that, if the option of rescission or compensation remained with him, he would elect the latter, the court might compel him to pay the compensation.

While the vendor has the option to abide by the contract or demand a rescission, the purchaser, who is in no way in fault, and has fully complied with his contract and acquired the title, even if he discovers the mistake, may not know what the vendor will elect, till the latter demands a rescission, or, in some form, declares or indicates his purpose. While the purchaser may prefer the rescission of the contract rather than a payment for the

1875.
January Term.
Western Mining
and Manufac-
turing Co.
v
Peytona Cannel
Coal Co.

excess in quantity, nevertheless he may be interested—nay, compelled—to improve the land or to dispose of it, or else to suffer disastrous sacrifice. When the purchaser, in good faith, has improved the land, a rescission of the contract without payment for the improvements would be inequitable. When the purchaser, without having discovered the mistake, has conveyed the land, he can no longer have an election between a rescission of the contract and the payment of compensation for the excess of quantity : And unless the latter purchaser knew the excess, and, on that account, paid more for the land than, if there had been no excess he would have paid; or the former purchaser, because of mistake in the latter sale, could recover from the latter purchaser, compensation for the excess; it would seem that the former purchaser would be no longer liable to his vendor for the payment of compensation.

If, while the vendor would, on demand, be entitled to a rescission, the purchaser discovers the mistake, it would seem that he should notify the former of the fact; and, thereupon, if the vendor does not in a reasonable time make his election and demand a rescission, his right to do so will be extinguished. But if the purchaser, without notifying the vendor, and with knowledge of his right to a rescission, wilfully conveys the land or puts a rescission beyond the reach of himself or the court, he should be subject to the payment of compensation.

When the purchaser has sold and conveyed the land to another, for a valuable consideration, without notice of the mistake as to the quantity, the right of the first vendor to a rescission of the sale and conveyance made by him, is extinguished; unless there be such mistake in the last sale and conveyance, made under such circumstances, that the vendor in that sale is entitled to a rescission; when, perhaps, the first vendor having such a right against the latter vendor, may be substituted to his right against the purchaser from him.

When a debtor conveys land to a trustee to secure the payment of debts, no definite price is fixed, and so the estimated quantity of the land is not an element in the fixation of the price. Consequently, excess in the actual quantity of the land cannot entitle the grantor in trust to a rescission of the conveyance or compensation for the excess.

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peytona Cannel
Coal Co.

It was settled in Virginia previous to the creation of West Virginia—whether on tenable principle or not—that the existence of antecedent debts is a valuable consideration for a conveyance or assignment of property to secure the payment of the debts, and that the trustee and creditors are purchasers for a valuable consideration. *Siter, Price & Co. v. McClanahan and others*, 2 Gratt. 280; *Richeson v. Richeson and others*, 2 Gratt., 497; *Wickham and Goshorn v. Lewis, Martin & Co.*, 13 Gratt., 427; *Evans, Trustee, v. Greenhow and others*, 15 Gratt., 153. Some of the cases on this subject relate to personal property, while others relate to real estate. But the validity of the consideration in no way depends on the species of property for which it is paid. If the existence of the debt is a valuable consideration for the assignment of personal property, it is such, as well, for the conveyance of real estate.

Then, in such case, the trustees and creditors are not in any manner liable to the grantor in trust, on account of mistake in quantity, and the grantor has no right against them to rescission or compensation, to which the original vendor may be substituted; and any right which the original vendor may have had to a rescission of the sale or conveyance, while the land remained that of the purchaser from him, is extinguished, unless the trustee and creditors—or at any rate the latter—had notice of the mistake from which the right of the original vendor emanated.

Possession of land is evidence that the possessor has the right to the possession that he enjoys. Generally,

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peytona Cannel
Coal Co.

a person purchasing a tract of land, is presumed to know who has possession of it, and to ascertain the character of the right by virtue of which he holds possession; or, if the purchaser does not do so, he is charged with notice of the character of the right, so far as this may be necessary to sustain the possession. But, it by no means follows, that the possession by a stranger to the title purchased, having no right of possession whatever, should be notice, or put a purchaser on inquiry, as to a mistake in a former sale and conveyance, relative to the quantity of the land—in no way pertaining to the right to the possession—that gave the former vendor the right to a rescission of the sale and conveyance, or compensation for the excess.

Independently of other circumstances, the effect of lapse of time before or after the discovery of the mistake, is a subject of much interest. On the one hand, abstract justice may suggest that lapse of time before the discovery of a mistake should not extinguish the right to redress, or bar the remedy therefor. On the other hand, the frailty and incompleteness, and consequent unreliability of evidence relative to matters long ago transpired, and the content, tranquility and prosperity of society, demand that titles and rights acquired in good faith, and long deemed valid and enjoyed without question, should not be disturbed or burdened with unanticipated conditions or qualifications. Actual fraud is so culpable and so odious, that, in equity, no lapse of time before discovery will bar redress. But the culpability and odiousness of fraud are not elements or concomitants of mere mistake. Whether the time that would bar an action of ejectment for the recovery of land, or a verbal contract for the payment of money, or damages for an injury, elapsed before the discovery of an excess in the quantity of land sold and conveyed, would bar a suit in equity for the rescission of the contract or for compensation for the excess, or not—it may properly be asserted, that if the vendor does not bring his suit within such

time after the sale and conveyance, he must make his 1875. January Term.

Western Mining and Manufacturing Co.
v
Peytona Cannel Coal Co. election and demand, give notice of his claim, or bring his suit within a reasonable time after the discovery of the mistake. He is not entitled to the time from the sale and conveyance to the discovery of the mistake, and the additional time thereafter that would bar an action, within which to elect, give notice or bring his suit.

But a positive declaration of inflexible rules of decision upon a subject presenting so many different aspects and varied circumstances as this, would be difficult and hazardous. The suggestions now made refer to the facts of the case in judgment, and are not asserted as absolute, unlimited rules applicable to all cases within the scope of the subject to which they relate.

In this case, as we have seen, before The Virginia Cannel Coal Company discovered the mistake as to the quantity of the land granted by Peyton to the Company, it made large improvements, not only on the land but in Coal River, for the development of the resources and enhancement of the value of the land, and conveyed the land, with these improvements and collateral benefits, to Smith and Brown, trustees, to secure creditors. Though some of the creditors originally were, and probably continued to be stockholders in the company, as far as we see, most of them were strangers thereto. Notwithstanding the improvements made by the company, the land did not sell for near as much as the company paid Peyton for it. The creditors realized nothing but their debts. Storm, DuBois and The Peytona Cannel Coal Company, the immediate, intermediate and final purchasers from and through the trustees, succeeded, at least, to the rights of the trustees and creditors, if to nothing more.

In March, 1860, when a survey was made, both The Virginia Cannel Coal Company and The Western Mining and Manufacturing Company discovered the mistake as to the quantity.

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peytona Cannel
Coal Co.

But, as far as appears, the latter company made no demand or election to rescind the contract. The period from the date of the deed and the close of the transaction in the spring of 1851, till the spring of 1866, when the suit was brought against The Virginia Cannel Coal Company, was nearly fifteen years—a period (exclusive of the time from the 17th of April, 1861 to the 1st of March 1865—if that be material—) more than twice as long as was necessary to bar an action on a contract for the payment of money, or for damages occasioned by a wrong; and more than two years (exclusive of the time mentioned, from 1861 to 1865), from the discovery of the mistake as to the quantity. And when the suit was brought, no process was served on The Virginia Cannel Coal Company or any defendant; and the object of the suit, as expressed in the order of publication, was simply to correct the line of the land conveyed by Peyton to The Virginia Cannel Coal Company where it conflicted with the grant from William M. Peyton to Mitchell and Jesse E. Peyton. And the period from the transaction in 1851 till the year 1867, when The Peytona Cannel Coal Company was made a party, was about sixteen years—a period (exclusive of the time from 1861 to 1865) longer than was necessary to bar an action of ejectment; and (exclusive of that time) more than three years after the discovery of the mistake as to the quantity.

The plaintiffs do not make any election or desire to have a rescission of the contract or make any tender or allege any readiness or ability to refund or pay to any party any money by such party paid for the land, or any expenditures made for improvements.

Under the circumstances and proceedings referred to, neither of the Plaintiffs in this suit could properly have a decree for a rescission of the contract and cancellation of the deed between Peyton and The Virginia Cannel Coal Company, or a decree against either that company or The Peytona Cannel Coal Company, for compensation for the excess of quantity.

The plaintiffs urged that Peyton did not warrant gen- 1875 January Term. erally that part of the land granted by him to The Vir- Western Mining and Manufacturing Co. ginia Cannel Coal Company, containing about one hundred acres more or less, the title to which, at the time v. Peyton Cannel Coal Co. of the grant, he did not have but afterwards acquired; and that, when he acquired the title, it did not vest in that company, but, by the subsequent deed from William M. Peyton to Mitchell and Jesse E. Peyton, the title to this part of the land vested in them. The Defendants controverted this, and urged that as soon as William M. Peyton acquired from Snodgrass the title to this part of the land previously granted by him to The Virginia Cannel Coal Company, the title vested in that company.

Anciently, a feoffment—which included a gift and livery of seisin of land—whether the feoffor had title or not, conferred on the feoffee the actual estate in the land; and, if the feoffor had not title at the time of the feoffment, but afterwards acquired it, the rightful title, so acquired, at once passed through him to the feoffee, and attached itself to the wrongful estate in the latter. But, if the heir of the feoffor afterwards acquired the title, it did not, thereupon, by the mere estoppel of the feoffment, vest in the feoffee of the ancestor. When, however, the feoffment was accompanied by an express warranty, if for any cause existing at the time thereof, the warrantee was afterwards evicted, he might recover against the warrantor or his heirs having assets descended from him, other land of equal value. (The form of the proceeding by which the recovery was attained is obsolete, and need not be here noticed). But when, after the feoffment, the warrantor or his heir acquired the title, if either had been allowed to sue and enforce it against the feoffee, the latter, in turn, would have had the right to sue the warrantor or his heirs having assets descended from him, and to recover land of equal value. Therefore, it was deemed that by reason of the warranty, when, after its execution, the warrantor or his heir acquired the title to the land, it at once passed to and vested

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peytona Cannel
Coal Co.

in the warrantee. This tenet, however, rested entirely on the liability of the warrantor, upon the eviction of the warrantee, to give to the latter other land; and was adopted, in order, by operation of law, to place the parties in substantially the same position in which, after an action and counter action, they would be left.

But a grant of land is a mere transfer of such title or right thereto as the grantor, at the time of the grant, may hold or have, absolutely or contingently. The latin word " *concessio*," derived from the operative word in the latin assurance, heretofore used in England, formerly was employed to designate that species of assurance : And the English word " concession," derived from the latin word, in its ordinary use, is exactly or nearly the equivalent of the word " grant;" though the former is not now, in Virginia or West Virginia, generally used— as the latter is—with reference to the conveyance of land or transfer of title, right or claim thereto. Certainly, a grant does not contain an assertion of title in the grantor, or imply a covenant with the grantee, to warrant the land. And a bargain and sale of land, intended, under the statute on the subject, to operate as a present conveyance or transfer, is not an assertion of title that will estop the bargainor, his heir or assignee, from subsequent assertion of an after-acquired title; and it does not imply a covenant of warranty. In England and in States of the Union in which the subject has not, by statute been regulated—or at any rate in Virginia and West Virginia—it has long been, and still is understood, that when parties to a grant or a deed of bargain and sale, intend that the grantor or bargainor shall be responsible for the title to the land, they should insert or require the insertion of one or more covenants which shall create, measure and determine the liability of the grantor or bargainor to the grantee or bargainee or his heirs or assigns, in case of want or imperfection of title, and consequent eviction.

When a grant, or a bargain and sale, is accompanied.

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peyton Cannel
Coal Co.

by a covenant that the grantor or bargainor will warrant the land generally—against the claims and demands of all persons—if, by reason of a claim or demand existing at the time of the execution of the deed, the covenantee is thereafter evicted, the covenantor becomes liable to the covenantee for the purchase money paid by the latter to the former for the land. And, if the covenantor, after the execution of the deed, acquires the title, it is deemed, at once, to vest in the covenantee, in order to preclude an action by the covenantor against the covenantee for the recovery of the land, and a consequent action by the latter against the former to recover from him the purchase money paid. But, when the grant or deed of bargain and sale is accompanied by a mere special warranty—against the claims and demands of the grantor or bargainor and all persons claiming and to claim through or under him—it is not intended that the covenantor shall be liable to the covenantee for any title, right or claim then existing in a stranger; but only, that if, by reason of any title or claim then existing in himself or in any other person having acquired it through or from him—whether then or afterwards claimed or asserted—the covenantee, his heirs or assigns, shall be evicted, the covenantor or his representatives shall be responsible for the price paid: And, whether the covenantor or person who acquired from him the title or right, at the time when the covenant was executed, actually claimed it, or did not then actually do so, but afterwards does in fact claim and assert the title, is not material. In either case, if the title right or claim vested or existing in the covenantor before or at the time of the execution of the covenant, be by any person enforced for the eviction of the covenantee, the liability of the covenantor is established.

If the covenant of general warranty were construed broadly, as a contract under any and all circumstances to indemnify the covenantee against "the claims and demands of all persons whomsoever," and the covenant of

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peytona Cannel
Coal Co.

special warranty were construed as a contract to indemnify him against "the claims and demands of the grantor and all persons claiming or to claim through or under him," though such claims or demands did not exist at the time of the execution of the covenant, then, if thereafter the covenantor should purchase the land from the covenantee, the former would be within the operation of his covenant, as entirely as the covenantor for special warranty would be, if, after such covenant, he should purchase the land to which it related, from another person who had the title thereto. But, clearly, the covenant of general warranty is not intended to apply to claims subsequently acquired from the covenantee; and the covenant of special warranty is not intended to apply to such claims, or to any claims subsequently acquired by the covenantor from the covenantee or a stranger.

Formerly, a deed of grant was not proper for the conveyance of an immediate estate of freehold in land. When the covenant of special warranty was framed and adopted, in England the deed of lease and release, and in Virginia the deed of bargain and sale were the conveyances in ordinary use. There were many claims which a releasor or bargainor might have to lands, that were not held to pass by either of these deeds. And for this reason, perhaps, the covenant of special warranty provided for the protection of the covenantee against the claims and demands of the covenantor himself, as well as those of all persons claiming or to claim by, through or under him.

In England and in all the States of the Union, as far as I am informed and from the nature of the subject must conjecture, there is much difficulty and uncertainty as to the titles to lands. In parts of Virginia and West Virginia, there has been and now is most grievous complication of the subject. In these States, the difference between the sale of land with general and with special warranty, has long been well defined and, not only by

lawyers but by the people, commonly understood. The price paid is generally influenced and determined by the probable strength and availability of the title or claim granted or sold, and the liability assumed by the vendor is embodied in the covenant. Usually if the vendor proposes to make himself responsible for the title, no matter in whom it may exist—or rather for the legal eviction of the grantee or bargainee—he inserts in the deed a covenant of general warranty. On the other hand, ordinarily, if the grantor or bargainor does not intend to make himself responsible for any title or right that at the time of the grant, may be in another, not conferred by the grantor or bargainor or in any manner occasioned by his act or failure to act—or for any eviction of the grantee or bargainee by reason of such title or right; yet, expressly or by implication, asserts that no such title has by him been conferred on another, or by his act or failure to act has been acquired by another, and proposes to make himself responsible if any such title has been so conferred or acquired; he inserts in the deed a covenant of special warranty. In Virginia and West Virginia, the covenants of general and special warranty, heretofore have been, and still are, the more prevalent covenants inserted in conveyances of land.

If, then, at the time the grantor executes the covenant of special warranty, the title to the land is in a third person, not because of any act or default of the covenantor, and such person afterwards asserts and enforces the title against the covenantee, the covenant is not thereby broken, and the covenantor is not in any way responsible. The covenantee pays nothing for the actual title, but pays only for the claim of the covenantor together with the covenant. No duty rests on the covenantor to procure the title for the benefit of the covenantee, or at all to protect him against, or indemnify him for the assertion and enforcement of the title and his consequent

57*

1875.
January Term.

Western Mining and Manufacturing Co.
v.
Peytona Cannel Coal Co.

eviction. The title in the third person may, without the agency of the covenantor, descend or otherwise come to him. Or it may be important to the interest of himself or others that he should purchase the land; and, accordingly, he may purchase it. Such a purchase cannot damage the covenantee. And there is no reason, whatever, at all sufficient, why the covenantor should not purchase the land from the owner and assert his title thereto, or dispose of the land, as any other person may do.

Finally, there is neither principle nor authority recognized in this State as satisfactory, to hold that when a grantor or bargainor executing a deed of bargain and sale, who in fact has not the title to the land granted or sold, covenants to warrant it specially, and afterwards acquires the title, it shall, by reason of the special warranty, pass to the grantee or bargainee.

Of course, if there be false and fraudulent representations as to a material fact, made by the grantor or bargainor, and relied on by the grantee or bargainee, and this be properly brought to the cognizance of a court of equity, it will be a subject for its consideration.

In the case in judgment, by the deed made on the 31st day of March, 1851, by Peyton to The Virginia Cannel Coal Company, Peyton granted, bargained and sold to the company, a tract of land described as containing 6,123 acres; and he covenanted that he was seised of a title in fee simple to 6,000 acres thereof, that he had power to convey that quantity, that the company should have quiet possession thereof, and that he would warrant generally that quantity; and Peyton covenanted that he would warrant and defend the surplus of 123 acres against himself, his heirs and all persons claiming under them. It appears that at the time of the execution of the deed, Peyton had title to all the land except about one hundred acres, or less, which was thereafter conveyed by Snodgrass to him, before he made the deed to Mitchell and Jesse E. Peyton.

It is manifestly just and reasonable that, under these circumstances, Peyton's covenants of title and general

warranty should be construed as applicable to 6,000 acres of the land, owned by him; and that his covenant of special warranty should be construed as applicable to the small quantity, less than 123 acres, not at the time of the grant owned by him but afterwards acquired.

1875.
January Term.

Western Mining
and Manufac-
turing Co.
v.
Peyton's Cannel
Coal Co

Then, the land in the year 1855 granted by Snodgrass to Peyton, did not thereupon vest in The Virginia Cannel Coal Company; but by the deed, made in the year 1857 by Peyton to Mitchell and Jesse E. Peyton, it vested in them.

On the 8th day of November, 1867, the Circuit Court declared its opinion that the line south 34° west 1,030 poles, described in the deed from Peyton to The Virginia Cannel Coal Company, is the true line contemplated and intended by the parties at the time of the execution of the deed, and that there was no mistake therein: And, on the 14th day of May, 1872, the Circuit Court declared that there was no error in that opinion, and decreed that all the bills be dismissed.

There was no error in the decree dismissing the bills: And it is therefore affirmed, with damages and costs. But the decree will not prejudice the legal title of either of the Plaintiffs to any land without the true boundary of the deed from Peyton to The Virginia Cannel Coal Company, or the land within such boundary not owned by Peyton at the time of the execution of that deed but afterwards granted by Snodgrass to him and by him to Mitchell and Jesse E. Peyton and by them to The Western Mining and Manufacturing Company.

Haymond, President, and Moore and Paull, Judges, concur with Hoffman, Judge, in the points decided, and in this opinion.

DECREE AFFIRMED.